# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

DEANDRE R. MCCOLLUM,

                Plaintiff,

v.

EDWARD A. DREWITZ,

                Defendant.

Case No. 21-CV-316-JPS

**ORDER**

## 1.    BACKGROUND

On August 13, 2018, Racine County Sheriff's Deputy Edward Drewitz ("Drewitz") attempted to pull over Deandre McCollum's ("McCollum") vehicle. When McCollum failed to stop, subsequently crashed his car, and fled on foot, Drewitz used his police dog, Friday, and a taser to apprehend McCollum. McCollum contests the level of force Drewitz used in this apprehension. Specifically, McCollum alleges that (1) Drewitz deployed his taser on McCollum after McCollum had surrendered and was not resisting arrest or fleeing; (2) Drewitz "fail[ed] and refus[ed] to intervene to stop [his] patrol dog" from biting McCollum after McCollum had surrendered; and (3) Drewitz released his patrol dog, Friday, on McCollum after McCollum was handcuffed and was not resisting arrest or fleeing, and allowed or caused Friday to bite McCollum again on his left arm. ECF No. 6 at 5–9.[1] McCollum does not appear to

---

[1] The complaint alleges four "violations" and five "claims for relief." ECF No. 6 at 5–9.

One of the claims for relief states that Drewitz "*continued* to tase Mr. McCollum after Mr. McCollum was handcuffed and not resisting." *Id.* at 9

challenge the use of Friday to terminate his flight on foot and take him down; rather, he claims Drewitz's use of force *after* the initial takedown was inappropriate. *See* ECF No. 35 at 1 (plaintiff's brief in opposition to the motion for summary judgment, arguing against summary judgment because a "jury can conclude that *after* McCollum was taken down by the police dog and was . . . surrendering, Drewitz allowed the police dog to continue to bite McCollum . . . and simultaneously discharged a taser at McCollum's left chest area") (emphasis added).

---

(emphasis added). That is, McCollum's amended complaint appears to allege that Drewitz activated his taser against McCollum more than once, with each alleged activation of the taser constituting a separate excessive force claim. However, Drewitz argues that he "deployed his taser a single time [and] any claims that [he] used the taser more than once must be dismissed." ECF No. 29 at 6. McCollum offers no arguments to the contrary and stipulates that Drewitz activated his taser only once. *See* ECF No. 27-1 at 4 (joint statement of facts where parties agree Drewitz "deployed his taser pulling the trigger a single time"); ECF No. 33 at 2 (McCollum's statement of disputed facts, stating that McCollum was "still connected to the wires of the [t]aser, which could have been reactivated at any time" but were not); ECF No. 35 at 12–17. Since Drewitz has moved for complete summary judgment on all of McCollum's claims, *see* ECF No. 28, and the parties' briefing does not argue any successive-tasing claim or any injury stemming from a successive tasing, the Court will consider this claim impliedly abandoned, and dismiss it accordingly. *See Palmer v. Marion County*, 327 F.3d 588, 597–98 (7th Cir. 2003) (deeming abandoned a claim that was not delineated in a brief in opposition to summary judgment).

Two of the claims for relief state that Drewitz released Friday and then, separately, that Friday "bit[] Mr. McCollum in his left shoulder" and "on the right arm." ECF No. 6 at 9. Drewitz's brief discusses McCollum's allegations that "Drewitz intentionally sicced Friday upon him after he was handcuffed" and that he was "bitten on the arm." ECF No. 29 at 21. McCollum's brief states that Drewitz released Friday who "attacked McCollum again" and "bit him again, this time on the left arm." ECF No. 35 at 17. The Court will therefore consider impliedly abandoned McCollum's claim that Friday bit McCollum on the *right* arm after Drewitz released Friday when McCollum was handcuffed, and dismiss it accordingly. *See Palmer*, 327 F.3d at 597–98.

The Court denied without prejudice Drewitz's initial motion for summary judgment due to the parties' failure to comply with the Court's trial scheduling order. *See* text order dated July 22, 2022. On August 22, 2022, Drewitz again moved (with leave of the Court) for summary judgment. ECF No. 28. The motion is now fully briefed, ECF Nos. 29, 35, and 37, and will be denied.

## 2. LEGAL STANDARD

Federal Rule of Civil Procedure 56 provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Boss v. Castro*, 816 F.3d 910, 916 (7th Cir. 2016). A fact is "material" if it "might affect the outcome of the suit" under the applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The court construes all facts and reasonable inferences in the light most favorable to the non-movant. *Bridge v. New Holland Logansport, Inc.*, 815 F.3d 356, 360 (7th Cir. 2016). "At summary judgment a court may not assess the credibility of witnesses, choose between competing inferences or balance the relative weight of conflicting evidence; it must view all the evidence in the record in the light most favorable to the non-moving party and resolve all factual disputes in favor of the non-moving party." *Abdullahi v. City of Madison*, 423 F.3d 763, 769 (7th Cir. 2005). Ultimately, "the non-movant need not match the movant witness for witness, nor persuade the court that her case is convincing, she need only come forward with appropriate evidence demonstrating that there is a pending dispute of

material fact." *Waldridge v. Am. Hoeschst Corp.*, 24 F.3d 918, 921 (7th Cir. 1994).

## 3. RELEVANT FACTS

The parties have submitted a joint statement of material facts as required by the Court's trial scheduling order. ECF No. 27-1. Alongside his motion and the joint statement of facts, Drewitz also chose to submit a statement of additional facts.[2] ECF No. 27-2 ("SAF"). Subsequently, McCollum submitted both his statement of disputed material facts (styled as his "proposed findings of fact") and his responses to Drewitz's additional facts, which the Court will also treat as a statement of factual disputes. ECF Nos. 33 and 32, respectively. Drewitz then submitted a combined reply to McCollum's two fact statement filings. ECF No. 36.

---

[2]Submitting a statement of additional facts is not expressly circumscribed in the Court's trial scheduling order, *see* ECF No. 11 at 2, and is contemplated in Civil Local Rule 56(b)(1)(B)–(C). But Drewitz's choice as the movant to submit a statement of additional facts puts the Court in an odd position. "If the parties cannot agree upon a set of facts, or if any of the disputed facts are material, then summary judgment is not appropriate." ECF No. 11 at 2 (citing Fed. R. Civ. P. 56(a)). Either Drewitz's additional facts are immaterial (and therefore irrelevant to the Court's summary judgment decision, and unnecessary to submit) or they are disputed (and therefore dispositive, provided McCollum can show the dispute is genuine). *See Kreuziger v. Milwaukee County*, No. 19-CV-1747-JPS, 2022 WL 3017431, at *1 (E.D. Wis. July 29, 2022).

If Drewitz's inclusion of the statement of additional facts was meant to preemptively demonstrate that McCollum could not genuinely dispute any of the material facts to his claim, Drewitz may have been better off arguing as much in his opening memorandum of law, relying solely on the joint statement of facts, and leaving it to McCollum to establish disputes of fact. Nonetheless, the Court has considered the "additional facts," McCollum's responses, and Drewitz's replies to determine what facts are undisputed.

Case 2:21-cv-00316-JPS   Filed 10/03/22   Page 4 of 32   Document 45

The parties spill a great deal of ink[3] debating the relevance and merits of their respective proffered facts—while their summary judgment briefs appear to argue only the issue of qualified immunity, their fact statement submissions essentially amount to a second set of briefs on the underlying question of whether there is a genuine dispute of material fact. After parsing the parties' fact submissions, the Court will adopt the relevant[4] and undisputed facts as set forth in the parties' joint statement of facts with minor, non-substantive edits. Further, the Court supplements the

_____

[3]Neither party has complied with the Court's directive that statements of "[i]temized disputed facts may not exceed one (1) page." ECF No. 11 at 2.

[4]Several of the parties' proffered facts are testimony by the parties as to their subjective beliefs. *See, e.g.*, ECF No. 27-1 at 4 (Drewitz's testimony that he "suspected Mr. McCollum could have been armed") and 5 (McCollum's testimony acknowledging that "Drewitz could not have known whether Mr. McCollum was concealing a gun and further that, from the position Mr. McCollum was in, if he had a weapon, he could have easily reached for it"). The Court has excluded such statements.

While these statements may be "facts" in the sense that they are thoughts or conclusions that occurred to the respective parties, or in the sense that the parties testified as such, when taken apart from the underlying facts giving rise to such subjective beliefs—for example, behaviors McCollum exhibited that, in a reasonable officer's estimation, may or may not be consistent with being armed or with surrendering—they are irrelevant in the excessive force "objective reasonableness" analysis. *See Graham v. Connor*, 490 U.S. 386, 396–399; *Pekrun v. Puente*, 172 F. Supp. 3d 1039, 1047 n.3 (E.D. Wis. 2016) (noting the objective standard is "measured by the facts known to a reasonable officer"); *Childs v. City of Chicago*, No. 13-CV-7541, 2017 WL 1151049, at *6 (N.D. Ill. Mar. 28, 2017) ("Establishing the facts of which the officer was subjectively aware still matters in the Fourth Amendment's reasonableness analysis[,]" including "evidence tending to show whether the things [an officer] claims to have observed, in fact, happened[.]"). An officer's subjective conclusion after perceiving certain facts and circumstances is distinct from those underlying facts and circumstances, both of which are distinct from the issue of whether the officer's conclusion was reasonable.

statement of undisputed facts by noting and analyzing factual disputes where appropriate.

Drewitz is a Racine County Sheriff's Deputy who, since April 1, 2012, has been a K9 Handler working with his assigned K9 (or police dog), a German Shepherd/Belgian Malinois mix named Friday. ECF No. 27-1 at 2 (joint statement of facts). Drewitz works primarily as a drug interdiction officer patrolling the area of Interstate 94. *Id.*

On Monday, August 13, 2018, at approximately 10:46 a.m., McCollum fled after Drewitz attempted a lawful traffic stop of McCollum's vehicle. *Id.* The legal basis for the traffic stop was that the windows of McCollum's vehicle were too tinted, in violation of state law and local ordinance. ECF No. 33 at 1 (McCollum statement of disputed facts); ECF No. 36 at 7 (Drewitz reply to McCollum's responses to joint statement of facts and SAF). Drewitz states that he suspected McCollum had engaged in a drug transaction prior to the attempted traffic stop. ECF No. 27-2 at 1. However, the parties (1) agree that Drewitz did not directly *observe* a drug transaction, *see* ECF Nos. 32 at 3 (McCollum responses to Drewitz SAF) and 36 at 3; and (2) have stipulated that Drewitz's observations that gave rise to his suspicion did not, at the time he activated his emergency lights to initiate the traffic stop, amount to objective reasonable suspicion to pull over McCollum for a drug offense. ECF Nos. 33 at 1 and 36 at 7.[5]

---

[5] The Court is not bound to adopt the parties' stipulation that Drewitz lacked reasonable suspicion to initiate a traffic stop for a suspected drug transaction. *Saviano v. C.I.R.*, 765 F.2d 634, 645 (7th Cir. 1985) ("[W]hile the parties are free to stipulate to the factual elements of the transactions, the court is not bound by the legal conclusions implied by the terminology utilized."). However, since objective reasonable suspicion for the traffic stop is not briefed or at issue in this case, the Court will accept the stipulation. As noted *supra*, note 4, Drewitz's subjective suspicions, without reference to the facts underlying those suspicions,

McCollum observed Drewitz's emergency lights activate and knew that Drewitz was trying to pull him over, but he decided not to pull over and fled anyway. ECF No. 27-1 at 2. McCollum's vehicular flight occurred on Main Street, a primary thoroughfare in downtown Racine, Wisconsin, on a weekday with congested vehicular traffic intersections and other pedestrian traffic. *Id.* McCollum did not recall how fast he was driving, but according to Drewitz, McCollum's speeds exceeded 65 miles per hour on a roadway that had a speed limit of 25 miles per hour. *Id.* at 2–3. McCollum

---

are not relevant at summary judgment on an excessive force claim. *See Graham*, 490 U.S. at 396–99.

The Court references Drewitz's claimed suspicions to contextualize the undisputed statements that follow. Since Drewitz's submissions have placed at issue the facts related to his suspicion, *see generally* ECF No. 29, the Court recounts and analyzes those facts. Prior to initiating the stop of McCollum, Drewitz conducted a separate traffic stop of a different vehicle; this vehicle had pulled over behind McCollum's vehicle, which was a gold Oldsmobile that had its "brake lights illuminated." ECF No. 20 at 4 (Drewitz declaration). Drewitz observed a man approach the Oldsmobile; Drewitz testified that the man had his left hand "clenched" and his right hand "open freely." *Id.* The man got into the Oldsmobile's front passenger seat. *Id.* After Drewitz completed the separate traffic stop, he saw the man exit the Oldsmobile, "holding what appeared to be a pizza box." *Id.* Drewitz states the Oldsmobile did not immediately pull away from the curb. *Id.* When the Oldsmobile pulled away from the curb, Drewitz followed and activated the emergency lights on his squad car. *Id.* at 5.

Footage from Drewitz's body-worn camera corroborates only that a man entered the front passenger side of McCollum's vehicle. ECF No. 20-2 at 2:38–2:46. McCollum has confirmed that a man entered his car, McCollum gave the man "Taco Bell," and the man exited his car. ECF No. 34-1 at 13 (McCollum deposition transcript). McCollum additionally testified that he sold this man "weed" while he was in the car, *id.*, and the parties stipulate that McCollum was later adjudicated guilty for a marijuana offense. ECF No. 27-1 at 7–8.

The Court finds that the only undisputed and relevant facts are that Drewitz saw a man get into McCollum's car and exit with food in his hand. *See* discussion *infra* note 16 and accompanying text.

testified that he did not run any red lights and slowed at the green lights. *Id.* at 3.

After McCollum crashed his vehicle and fled on foot, Drewitz and Friday pursued McCollum into a residential backyard. *Id.* Friday first encountered McCollum about halfway up the driveway to the backyard. *Id.* After continuing to run, McCollum was brought to the ground by Friday.[6] *Id.* McCollum tried to stand up again as Friday was still attempting to apprehend him. *Id.* McCollum was then brought to the ground again.[7] *Id.* McCollum was on his hands and knees while Friday was biting his calf when Drewitz arrived at the location. *Id.*

Drewitz then commanded McCollum to get on the ground, and at about the same time McCollum erected himself to his knees. *Id.* at 3–4. Drewitz's body-worn camera footage shows that, as McCollum gets on his

---

[6]McCollum attempts to dispute this fact by stating that Friday brought McCollum down "without any canine warnings" from Drewitz. ECF No. 33 at 1. This is irrelevant as McCollum has not made any claims that such warnings were required or that the use of Friday to perform the initial takedown was improper. The Court thus treats this fact as undisputed.

[7]The parties' joint statement of facts states that "According to Deputy Drewitz, he observed Mr. McCollum try to stand up as Friday was still attempting to apprehend Mr. McCollum and was brought to the ground again." ECF No. 27-1. That is, the wording of this statement makes it appear that McCollum challenges the accuracy of Drewitz's account. However, McCollum has not provided any record citations to dispute that he attempted to stand up again after Friday first brought him to the ground, *see* ECF Nos. 32 and 33, and body-worn camera footage corroborates Drewitz's account, *see* ECF No. 20-2 at 5:08–5:11. The Court therefore treats these facts as undisputed. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986) (quoting *First Nat. Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 280 (1968)) (A party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts . . . Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'").

Case 2:21-cv-00316-JPS   Filed 10/03/22   Page 8 of 32   Document 45

knees, he says something to Drewitz. ECF No. 20-2 at 5:12. McCollum contends that at this time he was saying, "I give up. I'm done." ECF No. 27-1 at 4.[8] By this time, McCollum's black pants had been pulled down around his hips, revealing black boxer shorts underneath; he was also wearing a tight-fitting short-sleeved shirt. ECF No. 20-2 at 5:12. McCollum's hands were by his sides; he did not have a weapon in his hands. *Id.* [9] Drewitz then deployed his taser, pulling the trigger a single time, striking McCollum's left chest with 50,000 volts. ECF No. 27-1 at 4.

McCollum then reached for his chest where the taser barb had made contact. ECF No. 20-2 at 5:14. He went face-first to the ground, with the taser barb and wire still attached to his chest; his hands were in front of and

---

[8]Again, the parties' joint statement of facts appears to frame these events as a set of competing accounts: "According to Deputy Drewitz, he commanded Mr. McCollum to get on the ground, and at about the same time Mr. McCollum erected himself to his knees. . . . Mr. McCollum contends he was raising his hands and saying "I give up. I'm done." ECF No. 27-1 at 3–4. McCollum has not disputed that Drewitz commanded him to get on the ground and that he then got to his knees; body-worn camera footage shows this occur as well. *See* ECF No. 20-2 at 5:12. As in note 7, *supra*, the Court therefore treats these facts as undisputed. *See Matsushita*, 475 U.S. at 586–87. McCollum's claim that he was raising his hands is plainly contradicted by the body-worn camera video. *See* ECF No. 20-2 at 5:12; *Scott v. Harris*, 550 U.S. 372, 378–81 (2007) (counseling courts to "view[] the facts in the light depicted by the videotape" if parties appear to dispute events that were filmed). The body-worn camera audio is unclear at this point, making it difficult to discern what McCollum says. *See* ECF No. 20-2 at 5:12.

[9]By way of disputing Drewitz's contention that McCollum may have been armed, McCollum references details about the appearance and positioning of his clothing and hands. ECF No. 32 at 2–3. Drewitz responds by again pointing to his suspicions that McCollum was armed, and the fact that McCollum's "hands were never up," but otherwise does not dispute McCollum's contentions. ECF No. 36 at 3. Body-worn camera footage confirms the appearance and positioning of McCollum's clothing and hands; accordingly, the Court treats these as undisputed material facts. *See Harris*, 550 U.S. at 378–81.

under his body as he lowered to the ground and then rolled partially onto his side. *Id.* at 5:16–19.[10]

It took about 40 to 50 seconds from when Friday finally brought McCollum to the ground to when Drewitz removed Friday after securing McCollum in handcuffs. ECF No. 27-1 at 5. During that time, McCollum said things to the effect of "he gives up," "he [Friday] won't quit" and "stop." *Id.* Friday continued to hold or bite McCollum's legs as McCollum moved around on the ground. ECF No. 20-2 at 5:19–53. At two points, Drewitz ordered McCollum to put his hands out to his sides, which McCollum did. *Id.* at 5:22, 5:33. At another point, Drewitz ordered McCollum to drop what he had in his hands, which McCollum also did. *Id.* at 5:27. At another point, Drewitz commanded McCollum to put his hands behind his back, which McCollum also did; at this time Drewitz applied handcuffs. *Id.* at 5:43.[11]

---

[10]Drewitz states in his SAF that the taser "did not appear to be effective." ECF No. 27-2 at 2. McCollum disputes this characterization by pointing to body-worn camera footage showing that "McCollum fell after being tased while the police dog continued biting his legs." ECF No. 32 at 4. Body-worn camera footage does not conclusively show whether the taser was completely effective or ineffective at incapacitating McCollum, since it shows McCollum continued to move after being struck by the taser (raising his hand to his chest), and shows McCollum either fell or lowered himself to the ground.

[11]Drewitz states in his SAF that he "did not remove Friday prior to handcuffing Plaintiff because, until Plaintiff was secured in handcuffs, he presented a risk of further flight and/or harm to Deputy Drewitz, Friday or the public." ECF No. 27-2 at 2. McCollum objects that "Drewitz's body camera shows McCollum prone and attempting to extend his arms while the dog continued biting his legs." ECF No. 32 at 4. Setting aside that subjective beliefs are irrelevant in the excessive force analysis, *Graham*, 409 U.S. at 397, body-worn camera footage shows Drewitz issuing various commands to McCollum, and McCollum both moving around on the ground and responding to those commands. Accordingly, the Court recounts what the body-worn camera footage shows as undisputed material facts.

Once Drewitz had handcuffed McCollum, Drewitz gave Friday the "let go" command and pulled Friday, who had already released from biting McCollum's calf, away from McCollum. ECF No. 27-1 at 5–6. Body-worn camera footage then shows that, while Drewitz is holding Friday by the collar in his right hand, McCollum rolls onto his back and raises his torso and head up, but later rolls back onto his stomach at Drewitz's command. ECF No. 20-2 at 5:54–6:06. Audio from the radio unit is heard and Drewitz raises his right hand to access the radio mounted on his shoulder. *Id.* at 6:11– 18. In doing so, Drewitz releases Friday's collar. *Id.* at 6:18. Friday runs toward McCollum. *Id.* Friday's head goes towards McCollum's backside first, then his shoulder and neck area. *Id.* at 6:19–21. Drewitz yells a command at Friday and then pulls Friday off McCollum. *Id.* at 6:19–21.[12]

Drewitz testified he did not release or command Friday to reengage with McCollum after he had been handcuffed. ECF No. 27-1 at 6.[13] Drewitz

---

[12]The Court has recounted the foregoing occurrences according to what the body-worn camera footage shows, because the parties' joint statement of facts summarizes this encounter as follows: "Moments later [after pulling Friday away from McCollum], Drewitz let go of Friday, at which point Friday reengaged with McCollum." ECF No. 27-1 at 5–6.

[13]Drewitz states in his SAF that he let go of Friday's collar in order to use his right hand to radio in his location. ECF No. 27-2 at 3. McCollum does not dispute that Drewitz let go of Friday's collar with the purpose of accessing his radio. *See* ECF No. 32 at 5–6. McCollum, rather, attempts to dispute this fact by arguing that "Drewitz could have held the police dog with his left hand and accessed the radio with his right hand" or could have handled the items in his hands differently. *Id*. These attempts to introduce a dispute of fact are speculative and immaterial. *See Matsushita*, 475 U.S. at 586–87.

The parties dispute the reason why Friday "reengaged" with McCollum. Drewitz contends that Friday "reengaged" with McCollum in reaction to movement by McCollum, ECF No. 27-2 at 3, whereas McCollum states the body-worn camera footage "does not reflect that the dog attacked McCollum due to his movement" but rather because "Drewitz let go of the dog," ECF No. 32 at 6.

claimed he reacted immediately to remove Friday. *Id.* From the time Drewitz released Friday to when Drewitz regained control of Friday was approximately 3 seconds. *Id.*

After his arrest, McCollum was transferred to Ascension All-Saints hospital at approximately 11:36 a.m. *Id.* His medical records show he had superficial lacerations to both of his legs, and was evaluated and treated for those lacerations including wound irrigation with saline, prophylactic antibiotics and bandages. *Id.* He also received an EKG to confirm normal heart rhythms. *Id.* He was discharged at 12:22 p.m. *Id.* Photos taken at the scene shortly after the incident depict the numerous bites. *Id.* (reproducing photos).

McCollum was later charged in the Wisconsin circuit court with four criminal counts for his conduct that day. *Id.* at 7; *see also* Racine County Circuit Court Case No. 2018CF001160, *available at* https://wcca.wicourts.gov. In the state criminal proceeding, he pled guilty to a felony count of possession with intent to deliver more than 200 grams of THC, and a felony count of being an operator fleeing and eluding an officer, involving bodily harm or property damage. *Id.* at 8.[14]

## 4.    ANALYSIS

Drewitz moves for summary judgment on that basis that Drewitz "acted reasonably under the circumstances" as established by relevant case law, or alternatively that, even if Drewitz's actions were unconstitutional, he is entitled to qualified immunity because "the law was not clearly

---

[14]The Court includes facts related to McCollum's eventual criminal charges because the parties have stipulated to them as undisputed; however, the Court finds these facts irrelevant to establishing what Drewitz knew at the time of the chase, apprehension, and arrest. *See* note 16 *infra.*

established" to put Drewitz on notice that his conduct violated McCollum's rights. ECF No 29 at 5. As such, Drewitz's arguments in his brief primarily go to analogizing and distinguishing relevant case law, rather than establishing that no genuine dispute of material fact exists in this case— though, as noted *supra* in Section 3, the parties' fact statement submissions argue back and forth to this effect. McCollum opposes summary judgment, arguing that "Drewitz appears to concede [the] evidence is such that a reasonable jury could find this use of force excessive and unreasonable," and that qualified immunity is not appropriate in this case because "well-established law" at the time of the incident "provided that such significant force cannot be used on a passively resisting individual." ECF No. 35 at 2.

Although district courts are empowered to "grant immunity on the basis that the right was not clearly established without determining whether there was a violation in the first place," they are not required to do so. *Abbott v. Sangamon County, Ill.*, 705 F.3d 706, 713 (7th Cir. 2013) (citing *Pearson v. Callahan*, 555 U.S. 223 (2009); *see also Harris*, 550 U.S. at 387 (Breyer, J., concurring) (noting that "lower courts should be free to decide the two questions in whatever order makes sense in the context of a particular case" since determining whether a constitutional violation occurred is at times "highly fact-dependent"); *Plumhoff v. Rickard*, 572 U.S. 765, 774 (2014); *Siler v. City of Kenosha*, 957 F.3d 751, 758 (7th Cir. 2020) ("In the case before us, we believe that our obligation to provide further guidance to the bench and bar and to the law enforcement community counsels that we . . . address the merits of the constitutional question presented.")

Drewitz has not made a persuasive argument that the Court should bypass Rule 56(a)'s requirement that he show there is no genuine dispute of material fact as to whether a constitutional violation occurred and

proceed straight to analyzing whether it was clearly established that his conduct was unlawful.[15] To the contrary, the parties' fact statement submissions and briefing demonstrate that the qualified immunity analysis is bound up in the issue of whether the facts demonstrate that a constitutional violation occurred.

The Court finds that Drewitz's motion for summary judgment must be denied. Summary judgment is not appropriate as to the claims that (1) Drewitz used a taser on McCollum after he had surrendered and (2) Drewitz allowed Friday to continue biting McCollum after he had surrendered because the facts presented would allow for a reasonable jury to draw divergent inferences as to whether McCollum was fleeing or resisting arrest, or whether he posed a threat to officer or public safety. Because resolution of these inferences bears directly on whether Drewitz is entitled to qualified immunity, the Court does not reach this determination. Further, summary judgment is not appropriate as to the claim that Drewitz released Friday to reengage with McCollum after McCollum was handcuffed because a jury could infer this use of force was unreasonable under the circumstances.

### 4.1 Excessive Force Standard

Arresting officers have "the right to use some degree of physical force or threat of force to effectuate [an] arrest," but the degree of force must not run afoul of the Fourth Amendment's "insistence on [objective] reasonableness." *Stainback v. Dixon*, 569 F.3d 767, 772 (7th Cir. 2009).

---

[15] At the same time, McCollum's reliance on *Saucier v. Katz*, 531 U.S. 991 (2001), in an apparent attempt to persuade the Court to conduct its qualified immunity analysis following that case's rigid two-step process, misses the mark, as *Pearson*, 555 U.S. at 236, unquestionably made the order of this process discretionary. ECF No. 35 at 3–4.

Case 2:21-cv-00316-JPS   Filed 10/03/22   Page 14 of 32   Document 45

Whether a degree of force is reasonable under the Fourth Amendment is influenced by "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham v. Connor*, 490 U.S. 386, 396 (1989) (citations omitted). "Whether a police officer used excessive force is analyzed from the perspective of a reasonable officer under the circumstances, rather than examining the officer's actions in hindsight." *Dawson v. Brown*, 803 F.3d 829, 833 (7th Cir. 2015).

"[I]f there are sufficient undisputed material facts to establish that the officer acted reasonably under the circumstances, the court must resolve the issue as a matter of law, rather than allow a jury to 'second-guess' the officer's action." *Dawson*, 803 F.3d at 833. On the other hand, summary judgment is precluded if a finding of reasonableness based on the facts as presented would require the court to "weigh all the evidence and [then] choose between competing inferences"—this is the province of the jury. *Abdullahi*, 423 F.3d at 770.

### 4.2 Qualified Immunity Standard

"Governmental actors performing discretionary functions are entitled to qualified immunity from suits for damages 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Abbott*, 705 F.3d at 713 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). To overcome a defendant's claim of qualified immunity, "the plaintiff[] must show both (1) that the facts make out a constitutional violation, and (2) that the constitutional right was 'clearly established' at the time of the official's alleged misconduct." *Id.* (citations omitted).

### 4.3 Use of Taser

Drewitz argues that the undisputed facts of this case, as compared to related cases, show that his one-time use of a taser after Friday took down McCollum was "reasonable" because Drewitz reasonably believed that McCollum was still actively fleeing or resisting arrest and/or could have been armed, or that his use of force is "at least subject to qualified immunity" because the law at the time did not clearly establish that his doing so violated McCollum's rights. ECF No. 29 at 6–10; *see also* ECF No. 37 at 6–10. McCollum counters by arguing that the record shows that McCollum was not armed and had surrendered, or that a jury could conclude as much. ECF No. 35 at 5–7, 12–16. McCollum further argues that Drewitz's subjective suspicion of drug activity that gave rise to his inference that McCollum may have been armed is both irrelevant at summary judgment and not properly supported with record evidence. ECF No. 35 at 7. Thus, McCollum argues, Drewitz's use of force was not reasonable and that the law clearly established on August 13, 2018 that an officer was not entitled to use significant force on a subject who was "at most, passively resisting" as McCollum was. *Id.* at 5–7, 13.

The record before the Court demonstrates that, even where the facts are undisputed, reasonable minds could differ as to whether a reasonable officer would have believed (1) McCollum had not surrendered and (2) McCollum was armed or posed a threat to safety. "Even though there may be no dispute over the basic facts, summary judgment is inappropriate if the parties disagree about the inferences to be drawn from those undisputed facts." *Bowyer v. U.S. Dept. of Air Force*, 804 F.2d 428, 430 (7th Cir. 1986); *see also Abdullahi*, 423 F.3d at 769. Summary judgment on the question of qualified immunity is also inappropriate where "determining

whether [defendant's] violation of [plaintiff's] rights was clearly established [as unlawful]. . . requires findings of fact." *Taylor v. City of Milford*, 10 F.4th 800, 808 (7th Cir. 2021). Accordingly, summary judgment is not appropriate on this claim.

An officer may permissibly use a taser to apprehend a suspect who is actively resisting arrest or fleeing. *Abbott*, 705 F.3d at 728 (holding that use of a taser where suspect "d[id] not contend that he had ceased resisting or fighting" before the officer used the taser—but rather the parties agreed that officer only used the taser *until* suspect ceased resisting—did not violate clearly-established law). Use of a taser on a suspect who has "'displayed an unwillingness to accede to reasonable police commands'" has been held to be reasonable. *Id.* (quoting *United States v. Norris*, 640 F.3d 295, 303 (7th Cir. 2011)).

The Court finds the undisputed facts in this case support competing inferences as to whether a reasonable officer would have known or believed McCollum had surrendered at the time Drewitz deployed his taser; accordingly, this is an issue for the trier of fact to resolve. *See Bowyer*, 804 F.2d at 430. The undisputed facts show that McCollum was indeed actively fleeing from Drewitz from the time he crashed and exited his vehicle to the time Friday caught up with him. It is also undisputed that after Friday brought down McCollum once, McCollum attempted to stand again. This behavior is consistent with an intent to continue fleeing or resisting arrest. *Johnson v. Scott*, 576 F.3d 658, 659–60 (7th Cir. 2009) (finding it was reasonable for officer to interpret plaintiff-arrestee's "struggling to get away from [police dog's] biting . . . as resistance"). On the other hand, the undisputed facts also show that, before and at the time Drewitz deployed his taser, Friday was biting McCollum's leg and McCollum was on his

knees facing Drewitz. This behavior is consistent with surrender—a person on his knees, facing a police officer, with a dog biting his leg, is less physically able therefore less likely to flee than a subject who is on his feet. *Compare id.* at 659 (finding it was reasonable for officer not to accept plaintiff-arrestee's surrender as genuine when plaintiff was still on his feet facing the officer).

It is also undisputed McCollum was saying *something* (though it is unclear what) to Drewitz. Reasonable jurors could, of course, disagree as to what McCollum was saying, after watching the body-worn camera video, and hearing testimony from both McCollum and Drewitz. Viewing this fact in the light most favorable to McCollum and assuming he verbally communicated his surrender—combined with McCollum's position on his knees with Friday biting his leg—a juror could find that a reasonable officer apprised of all these facts could have concluded McCollum did not intend to continue evading arrest and that use of a taser was unnecessary to apprehend him. A juror could conversely find that a reasonable officer would not take McCollum's verbal indication of surrender at face value in light of his prior behavior.

As to whether McCollum was refusing to accede to police commands, the record is similarly ambivalent. McCollum got to his knees at or around the same time Drewitz commanded him to "get on the ground." ECF No. 27-1 at 3–4. McCollum did not put his hands up, although the record shows he was not commanded to do so. *Id.* While one juror might find a reasonable officer would attribute McCollum's actions to intentional resistance, *see Johnson*, 576 F.3d at 659–60, the next juror might find a reasonable officer would think McCollum hadn't heard or understood his command to "get on the ground." *See Cyrus v. Town of*

*Mukwonago*, 624 F.3d 856, 862–63 (7th Cir. 2010) (affirming denial of summary judgment on excessive force claim where plaintiff-arrestee's failure to obey officer's commands after initial use of force was "susceptible of different interpretations"); *Becker v. Elfreich*, 821 F.3d 920, 927 (7th Cir. 2016) (finding plaintiff who claimed that, while a police dog held him by the ankle, he did not immediately comply with officer's order to get on the ground because he did not hear it would at most have been exhibiting passive resistance). Which inference is more reasonable to draw from McCollum's lack of perfect compliance is for a jury to decide.

An interrelated question is whether McCollum posed a threat to safety, thus justifying Drewitz's use of the taser. An officer may permissibly use a taser to apprehend a suspect whose "actions suggest[] an intent to use violence to fend off further police action,'" *Abbott*, 705 F.3d at 728 (quoting *Norris*, 640 F.3d at 303). More generally, if an officer reasonably believes a suspect is armed and poses a threat to the safety of himself or others nearby, the officer's use of significant force to neutralize the threat is reasonable provided it is proportional to the threat posed. *See Cyrus*, 624 F.3d at 863 (finding a jury could conclude officer's use of taser was excessive where he knew plaintiff-arrestee was unarmed); *see generally Muhammed v. City of Chicago*, 316 F.3d 680, 683 (7th Cir. 2002) (discussing the *Tennessee v. Garner*, 471 U.S. 1 (1985) standard for reasonable use of deadly force). Here, the facts support competing inferences as to whether Drewitz reasonably believed McCollum posed a threat to officer or public safety such that use of a taser was appropriate to obviate the threat.

Drewitz's arguments that his use of the taser was justified rely, to some extent, on his subjective belief that McCollum was a "suspected drug dealer," which he argues entitled him to believe McCollum "possibly

possess[ed] a weapon—and [was] in a position ready, willing[,] and able to use it." ECF No. 29 at 9. As noted above, Drewitz's subjective suspicions about McCollum's supposed drug dealing activity—divorced from the observations and occurrences giving rise to those suspicions—are not relevant on summary judgment, especially considering that the parties have agreed that his suspicions did not provide an independent legal basis for initiating the traffic stop. *See Graham,* 409 U.S. at 397; notes 4–5 *supra* and accompanying text. The undisputed facts show only that Drewitz saw a man get into McCollum's car and exit with food in his hand—viewing the observations and occurrences that supported Drewitz's suspicion in the light most favorable to McCollum, this did not establish that McCollum had likely engaged in a recent drug transaction.

But even if the Court accepts that the undisputed facts show that Drewitz, at the time he deployed the taser, reasonably believed McCollum recently engaged in a drug transaction,[16] the likelihood of McCollum's

---

[16]As noted *supra* note 5, the only undisputed and relevant facts are that Drewitz saw a man get into McCollum's car and exit with food in his hand. Whether these occurrences, *combined with* McCollum's vehicular flight after Drewitz observed them, would cause a reasonable officer to believe a drug transaction had occurred is not briefed and, as noted, not dispositive to the *Graham* analysis.

Although the record taken as a whole reflects that the behaviors and occurrences Drewitz observed were ultimately consistent with a drug transaction, *see Matsushita*, 475 U.S. at 586–87, the Court finds that post hoc evidence of McCollum's later drug offense conviction is not especially probative of what Drewitz knew at the time he initiated the investigation, especially in light of the parties' stipulation that Drewitz lacked reasonable suspicion of a drug transaction. *See* Fed. R. Evid. 401, 403. The parties agree that Drewitz's observations that the man who got into McCollum's car had his left hand "clenched" and his right hand "open freely," ECF No. 20 at 4 (Drewitz declaration), did not create reasonable suspicion for a drug investigation, but even if they did, they would not support the reasonableness of Drewitz's drug suspicions on a summary judgment posture

being armed on that basis alone is ultimately less integral to the Court's *Graham* analysis than the other undisputed facts as to McCollum's appearance and behavior prior to being tased.

Setting aside whether the crime at issue supported a presumption that McCollum had a weapon, the undisputed facts again could lead reasonable jurors to different inferences regarding whether McCollum's actions were consistent with potentially possessing or trying to use a weapon. It is beyond dispute that McCollum's hands were by his sides just prior to when Drewitz deployed the taser on him. *See* note 8 *supra* and

---

because whether to credit his testimony as to this observation is a jury determination. *See Abdullahi*, 423 F.3d at 769.

McCollum's later conviction for resisting arrest may well be probative of whether he was in fact still fleeing or resisting arrest when Drewitz applied the taser (i.e. whether a reasonable officer would have had a sufficient legal basis to arrest him for that offense). However, viewing this fact in the light most favorable to McCollum, it is irrelevant, because his later guilty plea to resisting arrest could still be consistent with his excessive force claim. McCollum acknowledges he was fleeing and resisting up until the initial use of force (the use of Friday to take him down), *see* ECF No. 35 at 1, but claims that all uses of force after that point were excessive because he had surrendered. *See DuFour-Dowell v. Cogger*, 969 F. Supp. 1107, 1118 (N.D. Ill. 1997) ("Under the facts of the present case, a finding of excessive force is not necessarily inconsistent with the validity of [plaintiff's] resisting arrest conviction."). Drewitz appears to have conceded that this resisting arrest conviction is highly relevant to the excessive force determination, as he has raised no defense that this conviction bars McCollum from recovery under the doctrine of *Heck v. Humphrey*, 512 U.S. 477 (1994).

As to McCollum's contention that "Drewitz's after-the-fact, self-serving statements that find no factual support in the record and are mere opinions or claims regarding his subjective 'beliefs' or motivations[] are irrelevant" in the objective reasonableness inquiry and "conclusory," ECF No. 35 at 7, the Court agrees that the statements as to Drewitz's suspicions, without reference to the facts underlying those suspicions, are irrelevant. However, the Court does not agree that Drewitz's declaration should be disregarded as evidence to the extent, as noted above, that his statements are based on personal knowledge and are not inconsistent with the record. *See* Fed. R. Civ. P. 56(c)(4).

accompanying text. His hands were near to his waistline, i.e., in a position that, if he had a weapon tucked into his waistband, he could access it. The undisputed facts also show that McCollum's pants were coming down below his hips and his clothing was tight-fitting. *See* note 9 *supra* and accompanying text. McCollum was facing Drewitz, with his hands in view, and Drewitz could see that McCollum did not have a weapon in his hands.

A reasonable juror might take a split-second look at McCollum and conclude that a reasonable officer, seeing no weapon nor any place where one would have possibly been concealed, would not have believed McCollum was armed; another equally-reasonable juror might focus on the positioning of McCollum's hands to conclude this meant he probably had a weapon nearby. *Compare Holmes v. Hernandez*, 560 F. Supp. 3d 1177, 1191–93 (N.D. Ill. 2021) (denying summary judgment and qualified immunity where "a jury could reasonably find that if a police officer chasing a suspect on foot saw no gun when the two came face to face, mere seconds before [the defendant] allegedly saw a gun, that suspect had no gun") *with Norris*, 640 F.3d at 303 (recognizing reasonableness of taser use where suspect "placed his hands in front of him, near his waistband area and out of view of the officers").

Irrespective of whether a drug crime or the offense of having excessively tinted windows was at issue, reasonable jurors could disagree as to whether McCollum's flight *on its own* would have permitted a reasonable officer in Drewitz's circumstances to conclude that McCollum likely had a weapon. *Compare United States v. Lyons*, 856 F. Supp. 2d 946 (C.D. Ill. 2012), *aff'd*, 733 F.3d 777 (7th Cir. 2013) (citing *United States v. Weaver*, 8 F.3d 1240, 1244 (7th Cir. 1993) (finding officers had reasonable suspicion to believe that suspect was armed where officers "testified that in

their experience, drivers often attempt to flee from police because they have weapons or drugs in their vehicle" and knew suspect's companion had previously fled from police, possessed firearms, and possessed drugs) *with Cyrus*, 624 F.3d at 863 (holding that a jury could find officer's use of force against suspect who "at most, committed a misdemeanor offense under Wisconsin law [such as evading an officer on foot], and [] was not exhibiting violent behavior" and who officer observed was unarmed was excessive) *and Ellis v. Wyndala*, 999 F.2d 243, 247 (7th Cir. 2016) ("While it was possible that [the suspect] carried a concealed weapon, as much as it is possible that every felon might be carrying a weapon, [the officer] had no particular reason to believe that [the suspect] was armed.").

Although the Court is mindful that "officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving," *Graham*, 490 U.S. at 397, the fact that Drewitz had mere seconds between when McCollum supposedly surrendered and Drewitz deployed force does not, on its own, necessarily entitle him to summary judgment—after all, the *Graham* analysis takes into account the totality of the circumstances. In light of the equally-reasonable inferences available from the undisputed facts, it is for a jury to decide whether it was reasonable for Drewitz, in the few seconds he had to draw and use his taser, to conclude McCollum was armed and/or had not genuinely surrendered.

The *Abbott* case illustrates the difference between a claim that is appropriate for summary judgment on these issues and one that is not. In that case, while upholding the district court's grant of qualified immunity on the claim of one plaintiff (a male) who alleged the defendant officer employed excessive force in tasing him, the Seventh Circuit reversed the district court's grant of summary judgment on the excessive force claim of

the other plaintiff, the male's mother. *Abbott*, 705 F.3d at 728, 732. The court pointed out that the male plaintiff "admit[ted] he was 'trying to fight with'" the defendant officer before and while he was tased repeatedly. *Id.* at 727. Thus, "even viewing the facts in a light favorable to [the male plaintiff]," the undisputed facts showed that, based on what the officer knew when he used the taser, a reasonable officer would have believed this plaintiff had not "ceased resisting or fighting." *Id.* at 727–28. In that light, without deciding whether the use of force was reasonable, the court held that the officer was entitled to qualified immunity because he did not violate clearly established law in using his taser on a suspect who was resisting as this plaintiff was. *Id.* at 728–29.

On the other hand, the Seventh Circuit reversed the district court's grant of summary judgment on the mother-plaintiff's excessive force claim. *Id.* at 729–31. The mother alleged the officer tased her once, causing her to fall to the ground and remain motionless, and then tased her again after she did not comply with the officer's order to get on her stomach. *Id.* at 729. On appeal she challenged only the grant of summary judgment on the second application of the taser. *Id.* The Seventh Circuit found that "there [was] no question this plaintiff was in fact subdued by the first tasing." *Id.* at 732. The court held that a jury could find that a reasonable officer would have recognized that the plaintiff had surrendered and was no longer actively resisting, and if the jury made such a finding, that "the second application of the taser could be determined by a jury to have been unreasonable." *Id.* at 730.

In so holding, the court implied that the *Graham* factors supported a finding of unreasonableness given that (1) the plaintiff had committed only a misdemeanor, nonviolent crime, (2) there was no evidence that she posed

a threat to the safety of the officer, herself, or others, and (3) though she did not comply with the order to get on her stomach, she "at most exhibited passive compliance." *Id.* Further, the court declined to decide whether the officer was entitled to qualified immunity, opining that although "it was clearly established on [the date of the subject incident] that it is unlawful to deploy a taser in dart mode against a nonviolent misdemeanant who had just been tased in dart mode and made no movement when, after the first tasing, the officer instructed her to turn over," "a definitive decision on the issue [could not] be had without further factual development." *Id.* at 730–32.

Considering the competing inferences outlined above, a jury could conclude that McCollum had surrendered and was not a threat to safety, that a reasonable officer would have known as much, and therefore that Drewitz's use of the taser constituted excessive force. Like the mother-plaintiff's claim in *Abbott*, McCollum contends that, after the initial use of force (Friday's two bites that brought him to the ground), he had surrendered and, though not perfectly compliant with Drewitz's command, was not actively resisting arrest, and posed no threat to safety. Since reasonable jurors could draw divergent inferences from the facts about whether it was reasonable for Drewitz to believe McCollum was still actively fleeing or presented a threat to officer or public safety, the Court declines at this time to decide whether Drewitz is protected by qualified immunity for the use of his taser. *See Taylor*, 10 F.4th at 808 (reversing district court's grant of qualified immunity at summary judgment where "determining whether [defendant's] violation of [plaintiff's] rights was clearly established [as unlawful]. . . requires findings of fact"). If a jury draws inferences in McCollum's favor and finds that he has established a

Case 2:21-cv-00316-JPS   Filed 10/03/22   Page 25 of 32   Document 45

constitutional violation, Drewitz may yet argue that the case law in this circuit did not clearly establish on August 13, 2018 that use of a taser in these particular circumstances was not permitted. *See id.* at 812 (citing *Estate of Escobedo v. Martin*, 702 F.3d 388, 398 n.4 (7th Cir. 2012) ("Though rare, trial courts may consider qualified immunity after trial.").

### 4.4 Use of Police Dog Friday Before Handcuffing

Drewitz additionally moves for summary judgment and qualified immunity on McCollum's claim that Drewitz's use of the police dog Friday to "apprehend and continue to engage with [McCollum] until [McCollum] was secured in handcuffs" was excessive force. ECF No. 29 at 10–20.[17] McCollum contends summary judgment is improper because McCollum had surrendered and it was clearly established on the date of the encounter that "police officers cannot continue to use force once a suspect is subdued." ECF No. 35 at 7–11 (quoting *Abbott*, 705 F.3d at 732). As above, the Court cannot grant summary judgment because the undisputed facts support different inferences as to whether a reasonable officer would believe McCollum had surrendered such that any further use of Friday to hold McCollum was improper.

---

[17] As noted *supra* Section 1, McCollum does not appear to challenge the use of Friday to terminate his flight on foot. *See also* ECF No. 35 at 7 (heading in plaintiff's response brief stating that Drewitz used excessive force by "continuing to let the dog attack and bite [McCollum] *after* he had shouted he was giving up and was raising his hands") (emphasis added). In light of this, the Court understands McCollum's excessive force claim with respect to use of Friday as including the brief moment from when McCollum (on his knees and facing Drewitz) allegedly verbally communicated his surrender to Drewitz, to when McCollum was tased, during which time Friday had hold of McCollum's calf. The claim, of course, also includes Friday's continued biting after McCollum was tased and up until McCollum was handcuffed and Friday was removed.

An officer may use significant force to apprehend or subdue a fleeing or resisting suspect, including having a police dog run down and bite and hold the suspect, provided that use of force is objectively reasonable under the circumstances as known to the officer. *See Johnson*, 576 F.3d at 660. However, "significant force is unreasonable after a suspect has stopped resisting or evading arrest." *Alicea v. Thomas*, 815 F.3d 283, 288 (7th Cir. 2016). "If an officer's threat perception changes, so too should her force calculus. . . . The sole fact a suspect has resisted arrest before cannot justify disregarding his surrender in deciding whether and how to use force." *Id.* at 288–89.

Summary judgment is not appropriate to the extent that McCollum challenges the continued use of Friday to bite and hold him by the calf *after* Drewitz tased him—reasonable minds could differ on whether McCollum's behavior after he was tased objectively indicate he had surrendered. The undisputed facts in this case show that, after Drewitz tased McCollum, McCollum—with the taser barbs still attached to him—fell or lowered himself to the ground, face-first, with his hands in front of him. After that point, McCollum was not perfectly still, at various points rolling over onto his side or back. However, he also complied immediately with Drewitz's various commands to put his hands out to his sides, release any items he was holding in his hands, and put his hands behind his back. McCollum also said things to the effect of "he gives up," "he [Friday] won't quit" and "stop." Whether a reasonable officer viewing this set of facts would have inferred that McCollum kept moving because he was still trying to flee, or that McCollum had fully surrendered and his movement was merely "passive noncompliance . . . requiring the minimal use of force," *Becker*, 821

F.3d at 927 (internal quotation marks and citations omitted), is for the trier of fact to decide.

Likewise, summary judgment is not appropriate to the extent that McCollum argues Drewitz should have known, just *before* tasering him, that he had surrendered and was not a threat to safety such that continued use of Friday was unreasonable. As discussed in Section 4.3, whether a reasonable officer viewing this set of facts would have inferred that McCollum's movements while he was on his knees and Friday held his calf indicated he was trying to reach a concealed weapon is a jury question. If a jury concludes no reasonable officer would have believed McCollum was armed before being tased, then Drewitz also could not have reasonably believed McCollum had a weapon after being tased. *See Holmes v. Hernandez*, 560 F. Supp. at 1191–93. Similarly, a juror could conclude that any officer would have understood McCollum to be "effectively trapped" and therefore no longer resisting, *Alicea*, 815 F.3d at 290, because McCollum was on his knees with Drewitz at point-blank range from him.

Resolution of McCollum's claim as to the use of Friday is bound up in fact determinations that only a jury can make. A jury could conclude that any reasonable officer would have known McCollum's surrender was complete, and that he was not a threat to safety when he faced Drewitz on his knees and allegedly communicated verbal surrender; if this is true, then both the use of the taser and the continued use of Friday constitute excessive force. A jury could alternatively conclude that McCollum's surrender was complete and he was no longer a threat only *after* McCollum tased him, but even then, McCollum may still have an excessive force claim for Drewitz's failure to promptly remove Friday before handcuffing him. Finally, the jury is best positioned to decide whether McCollum's alleged

surrender and lack of weapons were apparent to Drewitz such that use of *both* the taser and Friday immediately became unreasonable.

As noted above, whether the law clearly established that such acts were violations of McCollum's constitutional rights is to be determined after the facts are clarified. The Court declines at this time to decide whether Drewitz is protected by qualified immunity for the use of Friday to hold McCollum before handcuffing him. *See Taylor*, 10 F.4th at 808.

### 4.5 Use of Police Dog Friday After Handcuffing

Finally, Drewitz moves for summary judgment on McCollum's claim that Drewitz intentionally released Friday to attack McCollum after McCollum was handcuffed, on the basis that no reasonable jury, considering the undisputed facts and body-camera footage, could conclude that Drewitz did so "intentionally." ECF No. 29 at 20–22. Drewitz argues that his release of Friday was, at most, negligent, which is not actionable in a Section 1983 suit. *Id.* (citing *Neal v. Melton*, 453 F. App'x 572 (6th Cir. 2011)). McCollum argues to the contrary, contending that a reasonable jury viewing the facts "could conclude that Drewitz's releasing the dog again was intentional, rather than a negligent failure to control the dog," because Drewitz had other options such as leashing Friday or switching the hands with which he was holding Friday's collar and accessing the radio. ECF No. 35 at 17.

Summary judgment is not appropriate as to this claim. The undisputed facts show that, after giving Friday a command which the parties agree signified to Friday to disengage from McCollum, Drewitz let go of Friday's collar when he reached for his shoulder-mounted radio. At this point Friday moved quickly towards McCollum; Drewitz retook control of Friday a few seconds later. From these facts, and considering

McCollum was unquestionably subdued at the time Drewitz released Friday, a jury could find that, after a suspect was subdued, releasing a police dog who had just bitten the suspect was objectively unreasonable.

Whether Drewitz intended to release the dog or was merely negligent in doing so is irrelevant. Even accidental uses of force can implicate the Fourth Amendment's reasonableness standard. *See Johnson v. City of Milwaukee*, 41 F. Supp. 2d 917, 928–29 (E.D. Wis. 1999) (denying summary judgment on accidental shooting claim and finding that "if police conduct is unreasonable under the Fourth Amendment, the plaintiff can recover the damages caused by such conduct [without proving] the police specifically intend[ed] to cause such damages"). Still, "an inquiry into reasonableness requires scrutiny of the conduct leading up to" the use of force. *Id.* at 929.

Under this standard, the parties' dispute over why Friday reengaged with McCollum—either because McCollum moved or because Drewitz relinquished control of the dog, *see supra* note 12—is irrelevant, because regardless of the reason for Friday's reengagement, Drewitz could be liable if this use of force is considered unreasonable. At the same time, a jury could conclude that Drewitz's action to retake control of Friday within seconds after releasing him indicates that his use of force (whether subjectively intentional or accidental) points to the objective reasonableness of this use of force. The Court notes that, in any event, other courses of action that might have been available to Drewitz (such as leashing Friday) are irrelevant in the reasonableness analysis. *See Abbott*, 705 F.3d at 724 (counseling against "hindsight" analysis).

The parties also dispute whether McCollum sustained any injury from this encounter. *See, e.g.*, ECF No. 29 at 21 (Drewitz brief arguing that

medical records do not reflect treatment for any injury on either of McCollum's arms). "Injury is not an element of an excessive-force claim," but rather, it is evidence from which the jury can draw reasonable inferences about "the degree of force imposed and the reasonableness of that force." *McAllister v. Price*, 615 F.3d 877, 882 (7th Cir. 2010); *see also Holmes v. Village of Hoffman Estates*, 511 F.3d 673, 687 (7th Cir. 2007) ("A factfinder might conclude that [plaintiff's] injuries were slight but nonetheless that [the officer] employed more force than was justified.") It is for the jury to decide whether McCollum's injuries from Friday's reengagement were *de minimis*, and if so, whether this means Drewitz's release of Friday was reasonable.

As above, pending resolution by a jury of whether the use of force at issue in this case was reasonable or excessive, the Court declines to determine whether qualified immunity shields Drewitz from liability for this claim.

5.    **CONCLUSION**

Because the facts of this case present significant issues only capable of resolution by a jury, the Court denies Defendant Edward Drewitz's motion for summary judgment. The Court must defer on the corollary legal question of qualified immunity until the underlying factual issues are decided. The Court dismisses the two impliedly-abandoned claims specified *supra* note 1.

Accordingly,

**IT IS ORDERED** that Defendant Edward Drewitz's motion for summary judgment, ECF No. 28, be and the same is hereby **DENIED**; and

**IT IS FURTHER ORDERED** that Plaintiff Deandre McCollum's impliedly-abandoned claims that Defendant Edward Drewitz (1) continued

to tase McCollum after McCollum was handcuffed and not resisting and (2) released his police dog Friday and allowed Friday to bite McCollum on the right arm after McCollum was handcuffed be and the same are hereby **DISMISSED**.

Dated at Milwaukee, Wisconsin, this 3rd day of October, 2022.

BY THE COURT:

J. P. Stadtmueller
U.S. District Judge